IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 12-00055 JMS |
| | ) | |
| Plaintiff, | ) | ORDER DENYING DEFENDANT |
| | ) | MICHAEL SAKUMA'S MOTION |
| vs. | ) | TO SUPPRESS EVIDENCE |
| | ) | OBTAINED FROM STATE COURT |
| MICHAEL SAKUMA, | ) | SEARCH WARRANTS EXECUTED |
| | ) | BY HAWAII POLICE |
| Defendant. | ) | DEPARTMENT |
| _____ | ) | |

**ORDER DENYING DEFENDANT MICHAEL SAKUMA'S MOTION TO
SUPPRESS EVIDENCE OBTAINED FROM STATE COURT SEARCH
WARRANTS EXECUTED BY HAWAII POLICE DEPARTMENT**

## I. INTRODUCTION

A January 12, 2012 Indictment charges Defendant Michael Sakuma

("Defendant") with possession with intent to distribute, and conspiracy to

distribute and possess with intent to distribute, 500 grams or more of

methamphetamine in violation of 21 U.S.C. §§ 846, 841(a)(1), & 841(b)(1)(A).

These charges are in part the result of a November 15, 2011 search of Defendant's

residence pursuant to a search warrant by the Hawaii County Police Department

("HCPD") where over seven pounds of methamphetamine were seized.

On August 31, 2012, Defendant filed a Motion to Suppress the

evidence obtained from this search on the basis that both the warrant and the search

were defective and therefore violated the Fourth Amendment.  The government

filed an Opposition on September 28, 2012, and the court held an evidentiary

hearing on October 25, 2012.  On November 13, 2012, the parties filed

simultaneous supplemental briefing, and on November 19, 2012, the government

filed an optional supplemental reply.

Based upon the court's consideration of the supporting, opposing, and

supplemental memoranda, the arguments of counsel, the evidence admitted into the

record, and the credibility of the witnesses testifying at the hearing, the court finds

that the good faith exception applies to any deficiency in the warrant's description

of the place to be searched and/or the items to be seized, and that no other asserted

Fourth Amendment violations mandate suppression.  The court therefore DENIES

the Motion to Suppress.

## II.  BACKGROUND

At the October 25, 2012 evidentiary hearing, the court admitted into

evidence Government's Exhibits 1-3, 11, and 12, and Defendant's Exhibits 202,

203, 206, 209, 210, and 212.  The court also received oral testimony from HCPD

Officers Erich Jackson, Michael Abran, and Calvin Delaires, as well as from

George Tamashiro, Christina Kawamoto, and Priscilla Basque.  Based upon their

demeanor and manner of testifying, the court finds the testimony of the officers,

2

Tamashiro, and Kawamoto credible and their testimony to be consistent with the other evidence in the record.  Further, although there were some minor differences in the officers' testimonies regarding execution of the search warrant, the inconsistencies do not call into question the officers' credibility and are ultimately not relevant in determining whether the search was valid.  In comparison, based on her demeanor and manner of testifying, the court does not credit Priscilla Basque's testimony, who appeared primarily motivated to assist Defendant through any means possible.

Based on the credible testimony and evidence presented, the court finds the following facts by a preponderance of the evidence.

A.    **Application for Search Warrant**

On November 15, 2011, Officer Jackson submitted a Hawaii County Affidavit for Search Warrant ("Affidavit") to search and seize from Defendant and his residence methamphetamine, drug related paraphernalia as defined by Hawaii Revised Statutes ("HRS") § 329-1, articles of personal property tending to establish the existence of a conspiracy to use, sell, and transport methamphetamine, and various other items.  Gov't Ex. 11 at 117-18.  The Affidavit was the result of information gathered from various third parties as well as from HCPD surveillance on Defendant's residence.

Under the title "Historical Information," the Affidavit recites that a third party, Donald Lewis, was arrested for drug-related offenses on February 8, 2011 and relayed to officers that he had purchased pound quantities of methamphetamine from Defendant on four separate occasions between June 2010 and February 6, 2011. *Id.* at 119-20. Lewis described that Defendant resides within a yellow warehouse with a John Deere sign on it on Queen Kaahumanu Highway in Kailua-Kona directly across from the Kona Police Station. *Id.* at 119. Lewis described that Defendant "has a studio style apartment on the second level which is secured by a door and a gold key locking mechanism," and that "there are three separate set[s] of stairs leading to the upper level of the warehouse." *Id.* Lewis further relayed that three of the methamphetamine transactions took place in Defendant's studio, and that he observed in the studio quantities of methamphetamine ranging from thirteen to eighteen pounds. *Id.* at 120. Finally, Lewis relayed that Defendant told him that "he has two safes within the building and that he has access to all units within the warehouse except for one which is secured by the business owners." *Id.* at 121. The Affidavit further states that Lewis' information was consistent with that "from several independent sources that Sakuma has in his possession more than seventeen (17) pounds of methamphetamine," *id.* at 121-22, and that Defendant kept methamphetamine

4

"within a safe inside the warehouse."  *Id.* at 122.

Under the title "Probable Cause," the Affidavit states that Officer Jackson executed search warrants for Jeffrey Cho and his vehicle after Cho was observed leaving Defendant's warehouse on November 14, 2011.  *Id.* at 123. Officers seized 0.5 grams of marijuana, 3.9 grams of methamphetamine, and $1,590 in cash.  *Id.* at 123-24.  During his post-arrest interview, Cho stated that he owed Defendant $4,400, which he was paying off by delivering methamphetamine for Defendant, including the methamphetamine seized from Cho.  *Id.* at 124-25. He explained that he had been making two deliveries per day for Defendant during the prior three months.  *Id.* at 125.  Cho further relayed his observation that during the prior month Defendant had a gallon size Ziploc bag completely filled with methamphetamine, and that Defendant had advised Cho that in the past he had in excess of seventeen pounds of methamphetamine.  *Id.*

Under the title "Building Description," the Affidavit (1) describes that the warehouse is located at 74-592 A Hale Maka'i Place, Kailua-Kona Hawaii, (2) provides directions to the warehouse, and (3) attaches a Google map of the location.  *Id.* at 125-26, 132.  The Affidavit further describes that the warehouse is a cream colored metal structure enclosed with a gated chain link fence, and that it has a John Deere sign located towards the top of the building on its west side and a

5

garage bay door with a D&M hydraulics sign.  *Id.* at 125.  Under the title "Hawaii

Real Property Checks," the Affidavit asserts that a check of the Hawaii County

Real Property Tax website identified the warehouse as having "a physical address

of 74-592 A Hale Maka'i Place (formerly identified as 74-5223 Queen Kaahumanu

Highway), Kailua-Kona HI,"[1] and is owned by Suzuko and George Tamashiro,

AMFAC Distribution HI Inc., and the State of Hawaii.  *Id.* at 126-27, 137.  Officer

Jackson testified that although he knew that there were several units within the

warehouse, Defendant's specific space within the warehouse appeared to have had

no official unit number.

**B.    The Search Warrant**

Based on the Affidavit, Hawaii County District Judge Joseph P.

Florendo approved the November 15, 2011 search warrant.  The search warrant

commands the HCPD to search:

> A warehouse located at 74-592 A Hale Maka'i Place,
> Kailua-Kona, Hawai'i, 96740, occupied by Michael
> SAKUMA and Penny NOLAN; described as being a
> cream colored, metal structure; more particularly located
> by traveling east on Hale Maka'i Place from Queen
> Kaahumanu Highway, then making a right turn into the
> driveway leading to 74-592 A Hale Maka'i Place[.]  The

---

[1]  In July 2011, the address for the warehouse was changed from 74-5223 A Queen
Kaahumanu Highway to 74-592 A Hale Maka'i Place as part of the County of Hawaii's adoption
"of a uniform system of assigning addresses and naming streets to improve emergency responder
services."  *See* Gov't Ex. 12.

property located at 74-592 A Hale Maka'i Place, Kailua-Kona, HI 96740, is owned by two different owners, (1) Suzuko TAMASHIRO (2) George Y. TAMASHIRO. This inquiry also lists the property located at 74-592 A Hale Maka'i Place, Kailua-Kona, HI 96740, as Tax Map Key Number 740200180000; occupied by Michael SAKUMA, a 48 year-old male, with Date of Birth [REDACTED]- 1963, and having a Social Security Number with the last four numbers being 0192; to include but not limited to, all rooms and other parts therein, the surrounding grounds and any garages, storage rooms, outbuildings of any kind, vehicles, garbage cans, safety lock boxes, safes, and containers located within the property boundaries found under the control of Michael SAKUMA.

Gov't Ex. 3.

Officer Jackson testified that the search warrant authorized officers to search the entire warehouse as opposed to just Defendant's residence because numerous informants had told him that Defendant had full access within the warehouse.[2]  Specifically, Officer Jackson was told that Defendant performed general maintenance for the warehouse and therefore had keys for all areas of the warehouse.  Further, through surveillance Officer Jackson knew that Defendant was the only individual in the warehouse at night.

---

[2]  The government argues that Officer Jackson's testimony could be interpreted to mean that he believed officers were authorized to search only those areas of the warehouse that they determined were "under the control" of Defendant as stated in the warrant.  Doc. No. 58, Gov't Suppl. Reply at 2-3.  Although the government offers a conceivable interpretation of Officer Jackson's testimony, it is not the one the court believes that Officer Jackson intended.

7

The warrant commands the HCPD to seize, among other things:

1.    Methamphetamine and derivatives of same;
2.    Drug related paraphernalia as defined by Hawaii Revised Statutes Section 329-1 of the Hawaii Revised Statutes, described in Exhibit A and attached hereto;
3.    Articles of personal property tending to establish the existence of a conspiracy to use, sell, and transport methamphetamine including but not limited to personal telephone books, address books, telephone bills, papers, and papers containing lists of names, addresses and phone numbers of narcotics customers and suppliers, evidence of proceeds from sales of illegal drugs including but not limited to bank and financial statements such as deposit receipts and monthly statements, wire transfer receipts, and safe deposit box receipts; . . .

*Id.* Although the warrant refers to an "Exhibit A" providing the definition of "drug related paraphernalia as defined by Hawaii Revised Statutes Section 329-1 of the Hawaii Revised Statutes," it was not attached to the warrant and instead was attached only to Officer Jackson's Affidavit.

**C.    The Search -- Initial Entry into Warehouse**

Officer Jackson testified that although the HCPD does not usually execute a search warrant on the same day it issues, in this instance they decided to execute the warrant shortly after it was signed because Officer Jackson heard from informants that Defendant was preparing to move out of the warehouse. Thus, on

8

the afternoon of November 15, 2011, Officer Jackson assembled a team of officers

to execute the warrant.

The officers were divided into an entry team to secure the inside of the

warehouse, and a perimeter team to secure the multiple exits of the warehouse.

Upon arrival at the warehouse, officers in the entry team, dressed in raid vests with

the word "POLICE" printed on them, formed a "stack" formation at a glass door

on the middle side of the warehouse.  *See* Gov't Exs. 1, 2.  Although officers later

learned that there were several entrances to Defendant's studio, informants had

identified this particular glass door as the door that would allow direct access up to

Defendant's studio on the second floor.

To the left of this glass door was another door, outlined in red, that led

to a bathroom.  As the entry team formed their "stack" formation with their

weapons drawn, Christine Kawamoto, an office manager for one of the businesses

in the warehouse, exited from the bathroom.  Kawamoto testified that she had not

heard the officers approach the building while she was in the bathroom and was

therefore very scared when she saw them in close range with their weapons drawn.

Officer Delares, who was several feet away from Kawamoto, testified that he was

initially unsure whether Kawamoto was a threat and therefore pointed his gun at

her chest and ordered her to put her hands up.  Kawamoto complied with the

instructions, and Officer Delares escorted her away from the warehouse to Officer

Abron, who was part of the perimeter team.  After she was escorted away,

Kawamoto did not watch the officers enter the building and was (understandably)

very scared during this entire interaction.

**D.      The Search -- Entry Into the Warehouse and Defendant's Residence**

After the interaction with Kawamoto, the officers in their "stack"

formation announced their presence.  Officer Jackson testified that they knocked

on the glass door and announced their presence continuously for a minute to a

minute and a half, but received no response.  Because the glass door was locked

and had a metal handle that ran horizontally across the middle of the door, officers

gained entry through an open window to the right of the door.  Once in the

building, all officers vocalized their presence for safety purposes and they

proceeded down the hallway to another door.

Although the door at the end of the hallway had a punch lock on it,

Officer Jackson was able to "yank" it open.  Behind the door, officers found a

stairway leading up to another door with another punch lock.  Officers continued to

announce their presence up the stairwell and then used a ram to open the door at

the top of the stairwell.  Behind this door was a corridor with glass doors to several

rooms.  Officers proceeded down the hallway (still announcing their presence), and

came to another door with three gold locks on it.[3]  Upon opening this door,[4]

officers found Defendant vacuuming in the room.

Officers told Defendant that they were executing a search warrant,

placed him on the ground, and handcuffed him.  Officers then saw

methamphetamine in plain view and therefore arrested Defendant, showed him the

warrant, and walked him to the Kona Police Station across the street.

Officers proceeded with their search of Defendant's residence and

found, among other things, a safe hidden behind a bookshelf and drywall which

held methamphetamine.  Although Officer Jackson believed the warrant was for

the entire warehouse, he explained that they limited their search to Defendant's

residence because they did not believe that Defendant would have hidden any

contraband in areas that he could not control.  Specifically, Officer Jackson

explained that all of the locks on the doors and the hidden safe indicated that

Defendant had "trust" issues such that he would keep items in his area only.

At some point during the afternoon, George Tamashiro heard that

officers were executing a search warrant and went to the warehouse where he

keeps an office.  At the warehouse, Officer Jackson informed Tamashiro that they

---

[3]  The testimony regarding the building layout was confusing at times, which may in part
be due to the fact that this building was a multi-use warehouse and not an apartment building.

[4]  Officer Jackson could not recall whether force was used to open this last door.

11

were searching Defendant's residence.  Both Tamashiro and Officer Jackson

testified that Tamashiro did not ask for a copy of the search warrant, and Officer

Jackson did not provide him a copy.  Instead, a copy of the search warrant was left

at Defendant's residence after the search was completed.

### E.       Relevant Events After the Search

On November 16, 2011, Officer Jackson interviewed Defendant.

Consistent with HCPD policy, Officer Jackson provided Defendant a copy of the

search warrant to read and had a copy placed with Defendant's belongings.

Priscilla Basque, a friend of Defendant, testified that she picked up

Defendant's belongings from the jail, and that the warrant included with

Defendant's belongings was not the same as the one left at Defendant's apartment.

Other than some formatting differences, the only substantive difference between

the two warrants is that the one which Basque asserts she picked up from the jail

misspells Defendant's street address as "Makai'i Place" instead of "Maka'i Place."

*Compare* Gov't Ex. 3 with Def.'s Ex. 203.  Officer Jackson inadvertently attached

this version of the search warrant (with the misspelled street address) to a follow-

up Affidavit for Search Warrant to search a storage container rented by Defendant

that is not at issue in this action.  *See* Def.'s Ex. 203.  Based on Basque's demeanor

in testifying, the court does not find her credible.  And in contrast to Basque's

testimony, Officer Jackson credibly testified that he provided the correct search warrant (Gov't Ex. 3) as signed by Judge Florendo to Defendant.  Because the court credits Officer Jackson's testimony and discredits Basque's testimony, the court finds that Defendant was provided a correct copy of the November 15, 2011 search warrant.  *See* Gov't Ex. 3.

Yet another version of the November 15, 2011 search warrant was attached to a November 18, 2011 Affidavit for Search Warrant by Officer Mekia Rose for a follow-up warrant on Defendant's computers.  Compared to the November 15, 2011 search warrant signed by Judge Florendo, the version attached to Officer Rose's Affidavit left blank the items to be seized.  *See* Def.'s Ex. 212. Officer Jackson testified that he did not provide this version of the November 15, 2011 warrant to Officer Rose and that he cannot speak for what Officer Rose did. Officer Jackson did explain, however, that he makes several drafts of warrants and that officers have access to all versions.

## III.  <u>DISCUSSION</u>

Defendant argues that the November 15, 2011 search warrant and resulting search violated his Fourth Amendment rights and mandates suppression of the evidence collected during the search.  The court addresses each of Defendant's arguments in turn.

13

**A.      Whether the Warrant Properly Described the Place to be Searched**

Defendant argues that the search warrant impermissibly authorized

officers to search the entire warehouse even though probable cause was not

established for all areas within the warehouse.[5]  Specifically, the warrant identified

the place to be searched as:

> A warehouse located at 74-592 A Hale Maka'i Place,
> Kailua-Kona, Hawai'i, 96740, occupied by Michael
> SAKUMA and Penny NOLAN . . . to include but not
> limited to, all rooms and other parts therein, the
> surrounding grounds and any garages, storage rooms,
> outbuildings of any kind, vehicles, garbage cans, safety
> lock boxes, safes, and containers located within the
> property boundaries found under the control of Michael
> SAKUMA.

Gov't Ex. 3.

The court agrees that the plain language of the warrant authorizes

officers to search the entire warehouse.  Although the government asserts that the

warrant limited the search to the areas of the warehouse "found under the control"

of Defendant, Doc. No. 54, Gov't Suppl. Br. at 6, the government's interpretation

---

[5]  Although not entirely clear, Defendant also appears to argue that the address of the warehouse was incorrect and/or that the search warrant identified the wrong unit within the warehouse to be searched.  *See* Doc. No. 37, Def.'s Mot. at 23-24.  The evidence presented, however, establishes that the correct address of the warehouse is 74-592 A Hale Maka'i Place, Kailua-Kona, Hawai'i, 96740, that the "A" in "74-592 A Hale Maka'i Place" refers to the entire warehouse, and that the area where Defendant resided within the warehouse did not have an apartment number.  The court therefore rejects these arguments as unsubstantiated.

is not supported when this phrase is read in context with the rest of the language.

Specifically, the warrant authorizes a search of the "warehouse . . . to include but

not limited to [various enumerated areas] found under the control of Michael

Sakuma." The phrase "to include but not limited to" "indicates an intention that

enumerated examples following the phrase should not be construed as an

exhaustive listing." *See F.T.C. v. EDebitPay, LLC*, 695 F.3d 938, 943-44 (9th Cir.

2012) (citations omitted); *McKissick v. Yuen*, 618 F.3d 1177, 1185 (10th Cir. 2010)

(explaining that the role of the phrase "including but not limited to" "is to serve as

an example, an illustration, a representation of what's encompassed . . . [and] to

crab or limit its plain language"); Black's Law Dictionary (9th ed. 2009) (defining

"include" as "[t]o contain as a part of something. The participle *including* typically

indicates a partial list. . . . But some drafters use phrases such as *including without*

*limitation* and *including but not limited to* -- which mean the same thing"); 2A N.

Singer & J. Singer, Sutherland on Statutes & Statutory Construction § 47.23, p.

417 (7th ed. 2007) ("When 'include' is utilized, it is generally improper to

conclude that entities not specifically enumerated are excluded."). Thus, the court

rejects the government's suggestion that the "to include but not limited to"

language restricts the much broader language permitting a search of "a warehouse

located at 74-592 A Hale Maka'i Place, Kailua-Kona, Hawai'i, 96740." In other

words, the warrant did not limit the search to areas "found under the control" of

Defendant, but rather authorized a search of the entire warehouse.[6]

The court is therefore presented with a warrant authorizing a search of

the entire warehouse where Defendant lived in only one area of the warehouse, yet

an informant told officers that Plaintiff has access to almost all units in the

warehouse.   And this issue -- whether probable cause existed for a search of the

entire warehouse -- melds the particularity and probable cause requirements of the

Fourth Amendment.   *See* U.S. Const. amend. IV (stating that "no Warrants shall

issue, but upon probable cause, . . . and particularly describing the place to be

searched").   Specifically, where a warrant authorizes a search of a multi-unit

dwelling, at issue is whether the signing judge had a substantial basis for

concluding that probable cause existed to search all units, whether because

probable cause existed to search each unit or because each unit was under common

control of Defendant.   *See Mena v. City of Simi Valley*, 226 F.3d 1031, 1038 (9th

---

[6] Although the inquiry is an objective one, the court's interpretation is consistent Officer Jackson's testimony that he believed the warrant authorized a search of the entire warehouse. *See* Doc. No. 59, Tr. at 26-27 (explaining that he sought a warrant to search the entire warehouse because Defendant may have hidden items "throughout the warehouse"); *id.* at 27-28 (explaining that he "changed [his search] up" to include only Defendant's living quarters because upon entering Defendant's living quarters, Officer Jackson realized Defendant had "trust issues" and would have hidden items only in his area and not the rest of the warehouse); *id.* at 28-29 (clarifying that it was only after entry that they decided to limit their search).   Based on his testimony at the time, the court clearly understood Officer Jackson to convey that he believed the warrant permitted a search of the entire warehouse without restriction.

Cir. 2000) ("A warrant is valid when it authorizes the search of a street address with several dwellings if the defendants are in control of the whole premises, if the dwellings are occupied in common, or if the entire property is suspect." (quoting *United States v. Alexander*, 761 F.2d 1294, 1300-01 (9th Cir. 1985)); *Tynan v. United States*, 297 F. 177, 179 (9th Cir. 1924) (determining that a warrant to search entire floor of building was not overbroad where "the affidavit charged that the entire floor was used for the unlawful purposes stated, and the court was warranted in so finding"); *see also United States v. Clark*, 638 F.3d 89, 94-95 (2d Cir. 2011) (explaining that a warrant for multi-unit building fell "at the confluence of the Fourth Amendment's probable cause and particularity requirements, which courts and commentators have construed to demand that a search warrant for a multiple-occupancy building be supported by a showing of probable cause as to each unit." (citing 1 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 4.5(c), at 591 & n.94  (4th ed. 2004) ("LaFave")).

Under the particular facts of this action, however, if the good faith exception applies the court need not determine whether the warrant's description of the place to be searched lacked particularity and/or whether probable cause existed to search the entire warehouse. *See United States v. Crews*, 502 F.3d 1130, 1136 (9th Cir. 2007) ("Before embarking on the exercise of determining whether the

affidavit supported probable cause, we may proceed directly to the issue of whether there was good faith reliance."); *see also United States v. Shi*, 525 F.3d 709, 731 (9th Cir. 2008).  The court first outlines the good faith exception framework, and then applies it to the facts of this action to find that suppression is not required even if a Fourth Amendment violation occurred.

### 1.    *Good Faith Exception Framework*

The good faith exception applies where officers have "relied on the search warrant in an objective reasonable manner."  *Crews*, 502 F.3d at 1136; *see also United States v. Kow*, 58 F.3d 423, 428 (9th Cir. 1995) ("Evidence seized pursuant to a facially valid search warrant which later is held to be invalid may nevertheless be admissible if officers conducting the search acted in good faith and in reasonable reliance on the warrant." (citing *United States v. Leon*, 468 U.S. 897, 925 (1984)).  Although phrased "in terms of 'good faith,' the Supreme Court has 'eschew[ed] inquiries into the subjective beliefs of law enforcement officers.'" *United States v. Clark*, 31 F.3d 831, 835 (9th Cir. 1994) (quoting *Leon*, 468 U.S. at 922 n.23); *see also Herring v. United States*, 555 U.S. 135, 145 (2009) ("[O]ur good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal" in light of "'all of the circumstances.'" (quoting *Leon*, 468 U.S. at 922 n.23).  Rather,

the test is one of objective reasonableness, "determined not only with respect to the officers who executed the warrant, but also to the officer who provided the affidavit upon which the warrant was based." *Clark*, 31 F.3d at 835 (quoting *Leon*, 468 U.S. at 922 n.24); *see also Messerschmidt v. Millender*, 132 S. Ct. 1235, 1248 n.6 (2012) ("[T]he inquiry under our precedents is whether 'a reasonably well-trained officer in petitioner's position would have known that *his affidavit* failed to establish probable cause.'" (quoting *Malley v. Briggs*, 475 U.S. 335, 345 (1986)).

"Searches pursuant to a warrant will rarely require any deep inquiry into reasonableness," because "a warrant issued by a magistrate normally suffices to establish" that a law enforcement officer has "acted in good faith in conducting the search." *Leon*, 468 U.S. at 922 (citation and internal quotation marks omitted). "Nevertheless, the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable, and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922-23.  As *Crews* explains:

> [t]here are four circumstances in which the good faith exception does not apply because reliance is *per se* unreasonable: (i) where an affiant misleads the issuing magistrate or judge by making a false statement or recklessly disregarding the truth in making a statement; (ii) where the magistrate or judge wholly abandons her

>judicial role in approving the warrant, acting only as a "rubber stamp" to the warrant application rather than as a neutral and detached official; (iii) where the warrant is facially deficient in detail as to the place to be searched or the things to be found that the officers could not reasonably presume it to be valid; or (iv) where the affidavit upon which the warrant is based is so lacking in indicia of probable cause that no reasonable officer could rely upon it in good faith.

502 F.3d at 1136 (9th Cir. 2007). The government bears the burden of proving that officers relied on the search warrant in an objectively reasonable manner. *Id.*

### 2.   *Application*

Based on the following, the court finds that none of the four circumstances preventing the good faith exception applies in this case.

### a.   *Whether the affiant misled the issuing judge by making a false statement or recklessly disregarded the truth in making a statement*

Where the affiant misleads the issuing judge by making a false statement or recklessly disregarding the truth in making a statement, there are "clear indicia of bad faith" by the affiant -- for example, where the affiant makes a material misrepresentation which the officer "knew was almost certainly not true," or obtained the warrant based on false pretenses. *Id.* at 1138 (discussing *United States v. Sartin*, 262 F. Supp. 2d 1154, 1160 (D. Or. 2003)).

There is no evidence on the record that Officer Jackson made any

false statements or disregarded the truth in his Affidavit, much less any "clear

indicia" of bad faith.  Rather, the Affidavit outlines in detail the location of the

warehouse and the facts supporting probable cause to search the warehouse, and

there is no basis on the record to suggest that any statements contained therein are

false or misleading.  Indeed, Defendant does not even argue that this circumstance

applies in this action.  *See* Doc. No. 55, Def.'s Suppl. Br. at 15.  The court

therefore finds that Officer Jackson did not mislead the issuing judge.

> b.    *Whether the judge wholly abandoned his judicial role in*
>       *approving the warrant*

In general, "the exclusionary rule is designed to deter police

misconduct rather than to punish the errors of judges and magistrates."  *Leon*, 468

U.S. at 916.  Suppression is nonetheless necessary where the issuing judge fails to

exercise independent judgment by merely "rubber stamping" the warrant or acting

as a law enforcement officer:

> [C]ourts must . . . insist that the magistrate purport to
> "perform his 'neutral and detached' function and not
> serve merely as a rubber stamp for the police."  [*Aguilar
> v. Texas*, 378 U.S. 108, 111 (1964); *See Illinois v. Gates*,
> 462 U.S. 213, 239 (1983)].  A magistrate failing to
> "manifest that neutrality and detachment demanded of a
> judicial officer when presented with a warrant
> application" and who acts instead as "an adjunct law
> enforcement officer" cannot provide valid authorization
> for an otherwise unconstitutional search.  *Lo-Ji Sales,
> Inc. v. New York*, 442 U.S. 319, 326-327 (1979).

*Id.* at 914; *Crews*, 502 F.3d at 1137 (describing that this circumstance arises where the judge simply adopts the officers' "opinions and beliefs or authorized the search in a 'rubber stamp' manner"); *see also Lo-Ji Sales*, 442 U.S. at 327 (holding that the magistrate had abandoned his judicial role when "[h]e allowed himself to become a member, if not the leader, of the search party" by signing a warrant to search a book store for unlawfully obscene materials and then accompanying officers on the search, analyzing materials for their obscenity, and authorizing the seizure of those items he found unlawful).

Applying these principles, there is no evidence that the issuing judge acted as an "adjunct law enforcement officer" or did anything more than review the Affidavit for the purposes of making an independent and neutral determination of probable cause.  Instead, Defendant asserts that the issuing judge acted as a mere rubber stamp because (1) the signature page of the warrant did not include any substantive text (which ultimately allowed officers to mistakenly submit drafts of the warrant in support of follow-up warrants); and (2) the warrant failed to include an "Exhibit A" providing the statutory definition of "drug-related paraphernalia." Doc. No. 55, Def.'s Suppl. Br. at 12.[7]  Contrary to Defendant's argument, these

---

[7]  Defendant further argues that the operative warrant was the one attached to Officer Rose's Affidavit, which included no description of the items to be seized.  Doc. No. 55, Def.'s

(continued...)

alleged errors fail to suggest that the issuing judge failed to perform his job.

Specifically, although it may be a better practice to sign a warrant on a page that includes text unique to the particular warrant, there is no requirement that a signature page include such information.  Further, Officer Jackson attached "Exhibit A" to his Affidavit, which was part of the materials reviewed by the issuing judge.  As a result, the issuing judge's failure to realize that Officer Jackson had attached "Exhibit A" to his Affidavit only and not the warrant appears to be at most a clerical error and not evidence that the warrant was rubber-stamped.  *See also United States v. Gary*, 528 F.3d 329 (4th Cir. 2008) (holding that a magistrate's failure to catch an error in the date does not show that the magistrate failed to perform a neutral and detached function); *United States v. Hurd*, 499 F.3d 963, 968 (9th Cir. 2007) (determining that "failure to initial the description of [the defendant's] residence was a minor technical error rather than evidence of a constitutional deficiency in the contents of the search warrant"); *United States v. Fitzgerald*, 2009 WL 43510, at *5 (W.D. Va. Jan. 6, 2009) (determining the fact that the warrant did not contain the time of issuance on its face and that the affidavit contained a clerical error regarding the use of an informant does not

---

[7](...continued)
Suppl. Br. at 13.  As explained below, the court rejects this argument as factually incorrect.

amount to the magistrate becoming a rubber stamp for the police).  The court

therefore finds that the issuing judge did not abandon his role in signing the

warrant.

>    c.    *Whether the warrant is facially deficient in detail as to the*
>         *place to be searched*

The good-faith exception is not "available where the executing officer

simply could not have reasonably relied on a facially deficient warrant."  *United*

*States v. Michaelian*, 803 F.2d 1042, 1046 (9th Cir. 1986) (citing *Leon*, 468 U.S. at

923).  Where the warrant is facially deficient, "[o]fficers poised to conduct a search

should be able to ascertain that such warrant fails to offer sufficiently detailed

instruction and instead leaves them guessing as to their task."  *United States v.*

*Towne*, 997 F.2d 537, 549 (9th Cir. 1993) (citing *Ortiz v. Van Auken,* 887 F.2d

1366, 1370 (9th Cir. 1989)).  Thus, "[o]fficers attempting to execute a warrant so

facially overbroad that it precludes reasonable reliance will recognize, even after

the warrant leaves the hands of the magistrate, that it fails to offer guidance."  *Id.*

(citations omitted).

"[A] warrant is facially defective when it omits or misstates

information specifically required to be contained therein, *i.e.*, 'the place to be

searched, and the persons or things to be seized.'"  *Clark*, 638 F.3d at 102 (quoting

U.S. Const. amend. IV).  LaFave explains:

> Some situations easily come to mind in which the descriptive words are inherently inadequate to describe the place to be searched or the things to be seized. Illustrative would be a warrant to search "an apartment" in a specified multiple-apartment building or a warrant to search a specified place for "stolen goods."

LaFave, § 1.3(f), at 89 (footnotes omitted); *see, e.g.*, *Groh v. Ramirez*, 540 U.S. 551, 564 (2004) (holding that a warrant which failed to describe the persons or things to be seized facially deficient); *Kow*, 58 F.3d at 428 (determining that a warrant "encompassing essentially all documents on the premises" was facially deficient); *Clark*, 31 F.3d at 836 (holding that where "[i]t was apparent on the face of the warrant that the catchall phrase authorizing seizure of 'fruits and instrumentalities of [a] violation of' 21 U.S.C. § 841(a)(1) did not adequately describe the items to be seized," the warrant was facially deficient).

With that said, however, facial deficiency must be distinguished from the fourth *Leon* exception where the affidavit is so lacking in indicia of probable cause that no reasonable officer could rely upon it in good faith.  The facial deficiency inquiry focuses on the warrant itself, and does not delve into the affidavit, the knowledge of the officers, or other matters external to the warrant. To illustrate, LaFave provides the following "particularity-of-description" problems which raise issues of probable cause as opposed to facial deficiency:

One is that in which the description is simply too broad,

25

as where the warrant authorizes seizure of objects W, X
and Y but the probable cause showing in the affidavit is
only as to objects W and X, or where the warrant
authorizes seizure of all objects of Z variety but the
probable cause showing only covers some such objects
(e.g., not all patient records of a doctor suspected of
fraud, but only those of patients treated during the time of
the suspected fraud).  This kind of case, it is submitted,
does not fit within the *Leon* third situation, described as a
"facially deficient" warrant, as there is nothing inherently
wrong with the description when it is viewed in isolation,
and the problem is essentially a deficiency in the
probable cause showing vis-a-vis certain of the described
items.
. . .
Still another kind of particularity-of-description problem
is that in which the description initially seems all right
but then is a cause of difficulty when it comes time to
decide where to look or what to look for pursuant to the
warrant.  Illustrative is the situation in which the place to
be searched is described in terms of an apartment number
and street address and a variety of physical
characteristics, but at the scene it is determined that there
does not exist any single place to which all of those
descriptive factors apply.  At least in a literal sense, this
is not a "facially deficient" warrant either, for the
description is not inherently inadequate, and thus it may
well be that this situation is likewise not encompassed
within the *Leon* Court's third situation.

LaFave, § 1.3(f), at 87-88.

        Applying these principles, the warrant includes no facial deficiency in

describing the place to be searched.  Rather, it specifically identifies the place to be

searched by accurately providing the address, tax map key number, and description

26

of the warehouse, and including directions to its location. *See* Gov't Ex. 3. Given this correct and particular description, there is simply no basis to find that executing officers could not reasonably presume the warrant to be valid from its face. And this is exactly as the Second Circuit held in *Clark*, 638 F.3d at 103 (holding that warrant providing correct address for multi-unit dwelling was not facially deficient).

In opposition, Defendant argues that "there are four separate addresses for the warehouse" such that the address to be searched was overbroad. Doc. No. 55, Def.'s Suppl. Br. at 14. Defendant's argument is factually incorrect -- as recited in the warrant and as proven by the government at the hearing, the address for the entire warehouse is "74-592 A Hale Maka'i Place, Kailua-Kona, Hawai'i, 96740."

Defendant further argues that the warrant was facially deficient because the warehouse housed four separate businesses and the Affidavit failed to establish probable cause for searching all areas. *Id.* at 14-15. As explained above, however, this argument conflates the last two *Leon* exceptions -- that is, this argument is directed to whether the Affidavit establishes a colorable basis for probable cause to search the entire warehouse, and not whether the warrant itself is facially deficient. *Clark*, 638 F.3d at 103 ("Thus, to the extent probable cause was

lacking to support a warrant to search the whole of the premises particularly

described, the defect lies not in the warrant but in the warrant affidavit [and is

addressed in the fourth *Leon* concern]").  The court therefore finds that the warrant

was not facially deficient.

> d.  *Whether the affidavit upon which the warrant is based is so lacking in indicia of probable cause that no reasonable officer could rely upon it in good faith*

"[F]or the good faith exception to apply, the officer's affidavit must

establish at least a colorable argument for probable cause."  *United States v. Luong*,

470 F.3d 898, 903 (9th Cir. 2006) (citing *Leon*, 468 U.S. at 923).  A colorable

argument for probable cause exists where the affidavit "is 'sufficient to create

disagreement among thoughtful and competent judges as to the existence of

probable cause.'" *Id.* (quoting *Leon*, 468 U.S. at 926).  A court may find a lack of a

colorable argument for probable cause where the affidavit is "bare bones," "the

magistrate's probable-cause determination reflected an improper analysis of the

totality of the circumstances, or because the form of the warrant was improper in

some respect." *Leon*, 468 U.S. at 915 (citations omitted).

Defendant raises two issues -- whether the Affidavit established

probable cause that Defendant was possessing and/or distributing

methamphetamine from the warehouse, and whether the Affidavit established

28

probable cause to search the entire warehouse as opposed to his apartment only.

As to the first issue, the court finds that the Affidavit easily establishes probable cause that Defendant was selling methamphetamine from his apartment on the second floor of the warehouse. The Affidavit recites that (1) Lewis told officers that on four occasions between June 2010 and February 6, 2011, he purchased pound quantities of methamphetamine from Defendant in his apartment, Gov't Ex. 11 at 119-20; (2) Lewis further relayed that three of the methamphetamine transactions took place in Defendant's studio, and that he observed in the studio quantities of methamphetamine ranging from thirteen to eighteen pounds, *id.* at 120; (3) Lewis' information was consistent with that "from several independent sources that Sakuma has in his possession more than seventeen (17) pounds of methamphetamine," *id.* at 121-22, and that Defendant kept methamphetamine "within a safe inside the warehouse," *id.* at 122; (4) Cho told officers that he received the methamphetamine that officers found on him on November 14, 2011 from Defendant, who "came down from the upstairs unit" to give it to him, *id.* at 125; and (5) Cho told officers that he had been making two deliveries per day for Defendant during the prior three months, and that he observed during the prior month that Defendant had a gallon size Ziploc bag completely filled with methamphetamine. *Id.* at 125. This evidence, collected

over several months (and as recent as the day prior to the search warrant's

execution) and from multiple sources, created a reasonable nexus between

Defendant's alleged drug distribution and possession and his apartment.  *See*

*Crews*, 502 F.3d at 1136-37 (Probable cause exists were the affidavit "establishes a

reasonable nexus between the crime or evidence and the location to be searched.  It

need only be reasonable to seek the evidence at the location indicated in the

affidavit." (citations omitted)).

In opposition, Defendant argues that the Affidavit fails to establish

probable cause because Cho's statements are unreliable and not worthy of

credence.  Doc. No. 55, Def.'s Suppl. Br. at 6-7.  The court rejects this argument --

as the Affidavit recites, Cho was observed leaving the warehouse and officers

subsequently found that he had 3.9 grams of methamphetamine and $1,590 in cash.

These facts corroborate Cho's statements that he was distributing drugs for

Defendant, and further corroborate the information officers received from Lewis

that Plaintiff was distributing methamphetamine from the warehouse.  This

evidence therefore certainly establishes probable cause to search Defendant's

residence.

As to the warrant's description of the place to be searched, the warrant

authorized a search of the entire warehouse even though there were multiple units

housing four separate businesses.  Where the place to be searched encompasses

multiple units, the Ninth Circuit has held that:

> A warrant is valid when it authorizes the search of a
> street address with several dwellings if the defendants are
> in control of the whole premises, if the dwellings are
> occupied in common, or if the entire property is suspect.

*Mena*, 226 F.3d at 1039 (quoting *Alexander*, 761 F.2d at 1301); *see also Clark*, 638

F.3d at 95 (describing "control" as a factor relevant to probable cause).

Applying these principles, the Affidavit provides at least a colorable

argument for probable cause to search the entire warehouse.  Defendant's living

area within the warehouse had no unit number and the Affidavit explains that

informants described that Defendant lived on the second floor, which is accessible

by three different sets of stairs.  Gov't Ex. 11 at 119.  The Affidavit further

establishes that although Defendant resides in only one area of the warehouse,

Lewis relayed that Defendant told him "that he has two safes within the building

and that he has access to [] all units within the warehouse except for one which is

secured by the business owners."  *Id.* at 121.  These facts suggest that Defendant

had control of most areas within the warehouse, or at the very least that drugs

could be found almost anywhere within the warehouse, making the entire

warehouse "suspect."  Further, the Ninth Circuit has not defined what facts an

affidavit must contain to establish probable cause for control and/or access.  *Cf.*

*Clark*, 638 F.3d at 104-05 (determining that good faith exception applied to warrant to search multi-unit dwelling even though allegations of "control" were insufficient to establish probable cause).  This lack of guidance, combined with the particular facts of this case (*i.e.*, that Defendant lived on the second floor of a warehouse that normally held businesses and that he had access to other areas of the warehouse), is "sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause.'"  *Luong*, 470 F.3d at 903 (quoting *Leon*, 468 U.S. at 926).  The court therefore finds that the Affidavit was not so lacking in indicia of probable cause that no reasonable officer could rely upon it in good faith.

In sum, the court finds that none of the circumstances precluding application of the good faith exception applies to this case.  Indeed, although the Affidavit and warrant could have potentially defined more precisely those areas of the warehouse that were subject to search, any ambiguity did not result in the officers extending their search beyond the bounds of probable cause -- they searched only Defendant's living quarters.  As a result, even if the warrant was technically deficient, a reasonably well trained officer would not have known that the search was illegal given all of the circumstances.  *See Leon*, 468 U.S. at 922 n.23.  The good faith exception applies.

**B.      Whether the Warrant Described the Items to Be Seized**

Defendant argues that the warrant may have been the version attached to Officer Rose's November 18, 2011 Affidavit for Search Warrant and therefore provided no description of the property to be seized.  *See* Def.'s Mot. at 9-10.  Alternatively, Defendant argues that if the warrant was the one actually signed by Judge Florendo (Gov't Ex. 3), then it failed to adequately describe the items to be seized because it failed to attach an "Exhibit A" defining "drug related paraphernalia."  Based on the following, the court rejects both these arguments.

*1.      Whether the November 15, 2011 Warrant Included a Description of the Items to Be Seized*

Defendant's argument that the warrant failed to provide any description of the items to be seized hinges on the court accepting that the officers executed the version of the warrant that was attached to Officer Rose's Affidavit for a follow-up search warrant for Defendant's computers.  The court rejects this argument -- Officer Rose's Affidavit establishes at most only that he attached an earlier, incomplete version of the warrant to his November 18, 2011 Affidavit -- it does not establish that the warrant signed by Judge Florendo and executed on the warehouse failed to describe the property to be seized.[8]  Rather, Officer Jackson's

---

[8]  The government asserts that it does not plan on relying on any evidence obtained from the search of Defendant's computers.

credible testimony establishes that he presented Government's Exhibit 3 for Judge Florendo's signature, and that this was the warrant that was executed on Defendant's residence.

The court therefore DENIES Defendant's Motion to Suppress to the extent it argues that the November 15, 2011 search warrant provided no description of the evidence to be seized.

### 2. Whether the November 15, 2011 Warrant Included a Particularized Description of the Items to Be Seized

Defendant argues that even if the November 15, 2011 warrant that was executed on the warehouse is Government's Exhibit 3, its description of the property to be seized is inadequate because it failed to include the definition of "drug related paraphernalia" as defined by HRS § 329-1. Specifically, although the warrant refers to an "Exhibit A" as providing this definition, Officer Jackson failed to attach Exhibit A to the warrant and instead attached it to his Affidavit. The court rejects that the failure to include "Exhibit A" requires suppression of any evidence seized.

"The Fourth Amendment requires that a warrant particularly describe both the place to be searched and the person or things to be seized." *United States v. Mann*, 389 F.3d 869, 877 (9th Cir. 2004) (citing U.S. Const. amend IV). Thus, "[t]he description must be specific enough to enable the person conducting the

search reasonably to identify the things authorized to be seized." *Id.* (citing *United States v. Silva*, 247 F.3d 1051, 1057 (9th Cir. 2001); *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986)).  The purpose of this requirement is to prevent "general, exploratory searches," and to ensure "that the magistrate issuing the warrant is fully apprised of the scope of the search and can thus accurately determine whether the entire search is supported by probable cause." *Id.*  These requirements are met where the description is "reasonably specific;" it need not be "elaborately detailed." *Id.*

Although the warrant could have been more detailed by providing the definition of "drug related paraphernalia" in HRS § 329-1, numerous courts have found that a warrant allowing seizure of "drug paraphernalia" is not too indefinite to render a warrant invalid. *See, e.g.*, *Mann*, 389 F.3d at 878 (holding that warrant met the particularity requirement where it allowed officers to seize, among other things, "any dangerous drugs and drug paraphernalia"); *United States v. Moore*, 149 F.3d 773, 783 (8th Cir. 1998) ("Nor was the warrant's reference to 'drug paraphernalia' impermissibly broad or vague.  In the context of a search for marijuana, 'use of "paraphernalia" was sufficiently definite to make a violation of Fourth Amendment rights highly unlikely.'" (citing *United States v. Johnson,* 541 F.2d 1311, 1315 (8th Cir. 1976)); *United States v. Washington,* 48 F.3d 73, 77-78

(2d Cir. 1995) (holding that description of items to be seized as "[a]ny and all drug paraphernalia to include: scales, packaging materials, cutting agents, user paraphernalia (pipes, syringes) etc." not too broad); *see also United States v. Baldwin,* 987 F.2d 1432, 1436 (9th Cir. 1993) (holding that a scale, mirror, and vial are within the warrant's description of "paraphernalia used to weigh, store, and distribute cocaine"); *United States v. Robinson*, 2011 WL 1549416, at *7 (M.D.N.C. Apr. 21, 2011) (finding that warrant authorizing police to seize among other things, "drug paraphernalia (defined as '[a]ll equipment and materials used or designated to facilitate violations of the North Carolina Controlled Substances Act')" satisfied the particularity requirement).

> The court finds this caselaw persuasive and therefore finds that the warrant's authorization for officers to seize "drug related paraphernalia" as provided by HRS § 329-1, without providing the statutory definition, meets the particularity requirement.  Indeed, the government outlines that officers seized a glass pipe, several scales, a cut straw, and Ziplock baggies, Doc. No. 41, Gov't Resp. at 2, and these items fall well within the definition of "drug related paraphernalia."[9]

---

[9]  The court also recognizes that the warrant authorized seizure of "articles of personal property tending to establish the existence of a conspiracy to use, sell and transport methamphetamine," Gov't Ex. 3, and many items seized would fall within this category as well.

36

The court further finds that even if the warrant was not sufficiently particularized for failure to attach Exhibit A, the good faith exception applies such that the evidence should not be suppressed.  Officer Jackson attached Exhibit A to his Affidavit and not the warrant and these facts do not suggest that (1) Officer Jackson misled the signing judge, (2) the judge abandoned his judicial role in approving the warrant, (3) the warrant was so facially deficient such that officers could not reasonably presume it to be valid, or (4) Officer Jackson's Affidavit lacked indicia of probable cause.  Rather, based on the plain language of the search warrant, reasonably objective officers would understand that they were authorized to seize "drug related paraphernalia," the general definition of which any officer would know through their training and experience.  *See also Towne*, 997 F.2d at 549 (determining that good faith exception applied to warrant where an "Attachment B" providing a description of the items to be seized was incorporated by reference in the warrant, but not present when the search was executed).

The court therefore DENIES Defendant's Motion to Suppress to the extent based on Defendant's assertion that the warrant failed to particularly describe the items to be seized.

///

///

37

C.      **Whether Officers Complied with the "Knock and Announce" Requirement**

Defendant argues that HCPD officers violated the "knock and announce" requirement[10] by entering through four separate doors to get to Plaintiff's apartment without ever waiting for a response to their requests for entry. In making this argument, Defendant relies upon *Miller v. United States*, 357 U.S. 301, 313-314 (1958), and *United States v. DiCesare*, 765 F.2d 890 (9th Cir. 1985), *amended by* 777 F.2d 543 (9th Cir. 1985), as standing for the proposition that evidence seized during a search must be suppressed if officers violate the knock and announce requirement.  Doc. No. 37, Def.'s Mot. at 13.

As an initial matter, the credible testimony of the officers establishes that they properly knocked and announced in making entry into the warehouse and Defendant's residence.  But even if there was a violation, Defendant's reliance on *Miller* and *DeCesare* is misplaced -- as *Hudson v. Michigan*, 547 U.S. 586 (2006), makes clear, suppression is not an appropriate remedy for a violation of the knock and announce rule.

---

[10]  Although both parties cite to the federal "knock and announce" statute, 18 U.S.C. § 3109, it does not apply where the search warrant is executed by state officers only.  *See United States v. Valenzuela*, 596 F.2d 824, 830 (9th Cir. 1979).  There was no federal involvement in this action until after Defendant was charged with state law crimes.  Doc. No. 59, Tr. at 16-17. Thus, the relevant question is "whether the officers conduct was 'reasonable' within the meaning of the Fourth Amendment," *id.*, and, more importantly in this case, whether suppression is an appropriate remedy.

*Hudson* involved a conceded violation of the Fourth Amendment where state police officers executing a search warrant announced their presence upon arrival, but entered three to five seconds later without permission.  In holding that the officers' violation of the knock and announce rule did not mandate suppression, *Hudson* explained that "[w]hether that preliminary misstep had occurred *or not*, the police would have executed the warrant they had obtained, and would have discovered the gun and drugs inside the house." *Id.* at 592.  In other words,  the "illegal manner of entry was *not* a but-for cause of obtaining the evidence." *Id*.  *Hudson* reasoned that suppression is not an appropriate remedy "because the purposes of the knock-and-announce rule -- to protect bodily safety, property, and privacy -- are not vindicated by excluding evidence obtained after the rule has been violated." *See United States v. Ankeny*, 502 F.3d 829, 835 (9th Cir. 2007) (discussing *Hudson*, 547 U.S. at 593).  Stated differently, "the knock-and-announce rule does not protect 'one's interest in preventing the government from seeing or taking evidence described in a warrant' and that the social costs of exclusion for knock-and-announce violations out-weigh the benefits of deterrence." *Id*. (citing *Hudson*, 547 U.S. at 593).

In light of *Hudson*, even if a violation occurred (which the court finds did not occur), Defendant is not entitled to suppression. *Id.* ("We need not resolve

whether the knock-and-announce rule was violated and, if so, whether the violation was justified by exigent circumstances.  Under *Hudson*, the evidence should not be suppressed in any event.").  The court therefore DENIES Defendant's Motion to Suppress to the extent it argues that suppression is warranted in light of any violation of the knock and announce requirement.

**D.    Refusal to Provide Search Warrant to Defendant until Day after Search**

Defendant argues that HCPD officers withheld a copy of the search warrant from Defendant in violation of his Fourth Amendment rights.  Doc. No. 37, Def.'s Mot. at 20.[11]  The court need not determine whether these facts amount to a violation of Defendant's Fourth Amendment rights -- even if they did, Defendant is not entitled to suppression in light of *United States v. Hector*, 474 F.3d 1150, 1154 (9th Cir. 2007).

*Hector* addressed the same situation presented here -- the defendant sought suppression of evidence seized on a state search warrant because officers failed to present a copy of search warrant at the time of the search.  *Hector* determined that it need not resolve whether these facts amount to a Fourth Amendment violation because *Hudson* (discussed above) applies with equal force

---

[11]  The evidence and testimony establishes that Officer Jackson showed Defendant the search warrant at the time of his arrest, provided a copy during Defendant's interrogation on November 16, 2012, and placed a copy with Defendant's belongings at the prison and at his residence.

to these facts and forecloses application of the exclusionary rule. *Hector* explained that "[h]ere, as in *Hudson*, given that a valid search warrant entitled the officers to retrieve drugs and firearms in the apartment, '[r]esort to the massive remedy of suppressing evidence of guilt is unjustified.'" *Id.* (quoting *Hudson*, 547 U.S. at 599). Rather, "[r]egardless of whether the police officers had actually shown Hector the search warrant, they would have executed it and recovered the drugs and firearms inside his apartment. Thus, the acquisition of the evidence can hardly be characterized as a 'fruit of the fact' that the officers failed to present the warrant." *Id.* (citing *Hudson*, 547 U.S. at 600). As a result, *Hector* held that the defendant was not entitled to suppression.

Applying these principles here, even if Plaintiff's Fourth Amendment rights were violated by the officers' failure to provide Defendant a copy of the search warrant at the time of the search, Plaintiff is not entitled to suppression of any evidence. The court therefore DENIES Defendant's Motion to Suppress to the extent it argues that any evidence must be suppressed due to the HCPD's officers alleged failure to timely provide Defendant a copy of the search warrant.

## E.    Refusal to Provide Search Warrant to Tamashiro

Finally, Defendant argues that HCPD officers acted unreasonably in violation of the Fourth Amendment by refusing to provide a copy of the search

41

warrant to George Tamashiro, despite his repeated requests.  Doc. No. 37, Def.'s

Mot. at 19.  Factually, Defendant is incorrect -- George Tamashiro testified that he

never requested a copy of the search warrant and the search was limited to

Defendant's residence within the warehouse.

Further, even if officers had violated Tamashiro's Fourth Amendment

rights (which the court does not find), Defendant cannot seek suppression based on

a purported violation of another's Fourth Amendment rights -- "Fourth

Amendment rights are personal rights which, like some other constitutional rights,

may not be vicariously asserted."  *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978)

(quoting *Brown v. United States*, 411 U.S. 223, 230 (1973)).  As a result, "the

proponent of a motion to suppress has the burden of establishing that *his own*

Fourth Amendment rights were violated by the challenged search or seizure."  *Id.*

at 132 n.1 (emphasis added); *See United States v. Padilla,* 508 U.S. 77, 81 (1993)

(per curiam) ("It has long been the rule that a defendant can urge the suppression

of evidence obtained in violation of the Fourth Amendment only if that defendant

demonstrates that *his* Fourth Amendment rights were violated by the challenged

search or seizure.").

The court therefore DENIES Defendant's Motion to Suppress to the

extent it argues that suppression is necessary in light of any violation of

Tamashiro's Fourth Amendment rights.

## IV.  <u>CONCLUSION</u>

Based on the above, the court DENIES Defendant's Motion to

Suppress.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, November 27, 2012.



/s/ J. Michael Seabright
_____
J. Michael Seabright
United States District Judge

*United States v. Sakuma*, Cr. No. 12-00055 JMS, Order Denying Defendant Michael Sakuma's Motion to Suppress Evidence Obtained from State Court Search Warrants Executed by Hawaii Police Department